IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






AP-74,309






JOSHUA MAXWELL, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM BEXAR COUNTY





 

 PRICE, J., delivered the opinion of the Court in which Keller, P.J., and
Meyers, Womack, Johnson, Keasler, Holcomb, and Cochran, JJ., joined. 
Hervey, J., did not participate.


O P I N I O N



 A Bexar County jury convicted the appellant, Joshua Maxwell, of killing Rudolfo
Lopes in the course of committing a robbery or kidnapping. (1) Pursuant to the jury's
answers to the special issues set forth in Code of Criminal Procedure Article 37.071,
Sections 2(b) and 2(e), the trial court sentenced the appellant to death. (2) Direct appeal to
this Court is automatic. (3) The appellant raises eight points of error challenging his
conviction and sentence. We reject each of his contentions and affirm the trial court's
judgment.

I. FACTS

 The evidence at trial showed that Rudolfo Lopes, a sergeant with the Bexar County
Sheriff's Department, was murdered in San Antonio on or about October 11, 2000. San
Antonio resident Robert Brown encountered the appellant and Tess McFarland prior to
Lopes's murder. Brown met the appellant, who went by the name "Mo," and McFarland,
who went by the name "Trina," by responding to their ad on a "dating telephone line"
advertised in a magazine. The first time the appellant and McFarland came to Brown's
apartment, they talked for about an hour and Brown gave them money to buy food. 
Brown testified that they stole some rings from him at that time. Two or three days later,
the appellant and McFarland told Brown that they were in town for a friend's wedding
and needed a place to stay overnight. They spent the night at Brown's apartment and
gave him a ride to a liquor store the next day. Brown testified that they had a gray three-door vehicle with Florida license plates. He further testified that the car was dirty and
filthy-smelling, and that there was a container in the car with a chameleon lizard inside it. 
Brown let them use his phone before they left that afternoon. After they left, a man called
asking for "Mo" and "Trina." 

 Lopes's wife testified that Lopes was scheduled to work at the Bexar County Jail
from 10:00 a.m. to 9:00 p.m. on October 11. Lopes left for work that morning in his gold
four-door Chevrolet pickup truck, but he never returned home that night. Lopes often
carried a briefcase and wore a gold chain necklace with a cross and anchor pendant. 
Lopes normally carried a Glock pistol issued by the Sheriff's Department.

 An investigations officer with the Security Service Federal Credit Union testified
that Lopes had a checking account, a savings account, an ATM card, and a Visa card at
the credit union. Records show that shortly after 7:00 p.m. on October 11, someone using
Lopes's ATM card at the credit union's Southwest Military Branch made two successful
withdrawals of $300 and $100. The person using the card attempted to withdraw more
money from Lopes's checking and savings accounts, but the transactions were denied. A
surveillance camera photographed a woman leaning out of the driver's side of a vehicle
using the ATM.

 Charles Dudley, the owner of a martial arts school in a northeast San Antonio strip
center, testified that he left work with his family about 9:00 p.m. on October 11. They 
noticed a gold Chevrolet pickup truck driving around to the back of the strip center, so
they got into Dudley's car and drove behind the strip center to see what was going on. 
The truck was parked next to a hole in the privacy fence that separated the strip center
from the field behind it. Dudley observed a woman with long, bushy hair and glasses
sitting in the driver's seat and a man slumped down in the passenger seat. As Dudley
drove by, the man and the woman stared straight ahead. Dudley thought it odd and
slowly drove by them a second time and put his headlights on the truck. The man and the
woman continued sitting in the truck staring straight ahead. 

 Debra Guzman, who lived in a residential area behind the strip center, testified that
she and her husband were watching the Presidential Debate on the evening of October 11. 
She heard one loud gunshot between 9:00 and 10:00 p.m.

 Lopes's body was discovered in the field behind the strip center on October 12. 
He was blindfolded and was lying face down with his arms inside his shirt and his hands
bound together. There was a white cotton cord tied around one of his wrists, and both
wrists were tightly bound together with a clear telephone cord. Police found a spent shell
casing on the ground near Lopes's body.

 A security guard at the Windsor Park Mall in San Antonio first ticketed a gray
Chevrolet Corsica with Florida license plates for overnight parking at 4:15 a.m. on
October 12. The abandoned vehicle continued to receive parking tickets until it was
reported to police on October 15. Police discovered that the vehicle identification number
and the license plate did not match and that the vehicle was "flagged" from out of state in
reference to another homicide case. Inside the car were letters containing references to
the appellant and McFarland, a package of cigarettes, photographs of McFarland and the
appellant, a "Scotsman Inn" hotel receipt with the name "Trina Dorris," and a dead lizard. 
 At 4:40 p.m. on October 17, police officers Joseph Juarez and Jesus Pena were on
duty in downtown San Francisco, California, when they saw a gold pickup truck speed
through an intersection and almost hit a pedestrian. The officers stopped the truck, exited
their vehicle, approached the truck from the rear, and asked the male driver to turn off his
engine. The driver instead drove away and led them on a chase through downtown San
Francisco. Halfway through the chase, the driver of the truck shot at them. The bullet hit
the officers' windshield and came within inches of striking Officer Juarez. Glass from
the windshield sprayed the inside of the police car and scratched Officer Pena's eyes. 
Additional police officers became involved in the chase. The driver continued shooting
at police and the police returned fire. Officer Richard Seidell testified that at one point
the driver "reached out with his left arm and hand and raised his middle finger and
flipped us off." 

 The chase finally ended when the truck became stuck in traffic. The truck was
identified as Lopes's vehicle. The driver and passenger of the truck were identified as the
appellant and McFarland. McFarland suffered a neck injury during the chase. The
appellant was wearing a gold-chain necklace when he was apprehended. 

 The police searched the truck and found Lopes's badge, Lopes's credit card from
the Security Federal Credit Union, and a State of Indiana identification card for "Trina
Dorris" with McFarland's picture. Police also found in the truck, Lopes's Glock pistol, a
Chinese 9-millimeter pistol, and a briefcase in the truck.

 The medical examiner who performed Lopes's autopsy testified that his death was
caused by a single gunshot wound to the top of his head. The 9-millimeter bullet entered
the top of Lopes's head, exited his chin, re-entered his body through his chest, and lodged
between his sternum and his heart. A firearms examiner testified that the Chinese 9-millimeter pistol found in Lopes's truck was the weapon that fired the bullet that was
recovered from Lopes's chest and the shell casing that was found near his body.

 Detention officers Calvin Robinson and Wendell Busby testified about an incident
involving the appellant while he was in the Bexar County Jail awaiting trial. Robinson
testified that the appellant was banging on his cell door at about 6:10 p.m. on September
1, 2001. The appellant told Robinson he was upset about not receiving his account
balance earlier that day. When Robinson told the appellant he would get his account
balance for him later, the appellant became more upset and began banging on the door
even harder. The appellant called Robinson a "black, mother-fucking nigger" and said
that he would "bust [Robinson's] face if he could get out of his cell." He also said "if he
could get out of that cell, he'd kill [Robinson], just like he had killed [his] home boy,
Lopes." Robinson told the appellant to calm down and went back into the office where
Busby was located. The appellant, using a "pleading-type of voice," then mimicked how
Lopes had begged for his life, stating repeatedly, "Please don't kill me." The appellant
used a stronger, higher, and more authoritarian voice when he described his response: 
"Shut up, bitch . . . I'm going to kill you anyway." 

 Busby's testimony confirmed Robinson's version of events. Busby added that
another inmate yelled something at the appellant after the appellant mimicked Lopes, and
the appellant replied, "I don't care what I said." Both Robinson and Busby denied doing
anything to provoke the appellant.

 Defense witness Sergeant David Ryker testified that he investigated the incident at
the Bexar County Jail on September 1. The appellant made no mention of Lopes and told
Ryker that Robinson was harassing him. Defense counsel also called an evidence
technician with the San Antonio Police Department who testified that there was never a
comparison made on a plaster shoe cast of a footprint taken at the crime scene on October
12, 2000. Finally, Bexar County Deputy Sheriff Daniel Grasser testified that he could not
locate the shoes that the appellant was wearing when he was arrested in San Francisco.

II. SUFFICIENCY OF THE EVIDENCE

A. Legal Sufficiency

 In his seventh point of error, the appellant challenges the legal sufficiency of the
evidence during the guilt phase of the trial. In order to convict the appellant of capital
murder, the charge required the jury to find beyond a reasonable doubt that the appellant
intentionally committed murder in the course of committing or attempting to commit
kidnapping or robbery. 

 In evaluating the legal sufficiency of the evidence, we view the evidence in the
light most favorable to the verdict and determine whether any rational trier of fact could
have found the essential elements of the offense beyond a reasonable doubt. (4) When the
trial court's charge authorized the jury to convict on alternative theories, as it did in this
case, the verdict of guilt will be upheld if the evidence was sufficient on any one of the
theories. (5) 

 The appellant argues that "the evidence was legally insufficient to prove that he
had anything to do with the actual death of [Lopes]." He attempts to shift the blame to
McFarland, arguing that she was the only person shown on the credit-union surveillance
tape shortly after 7:00 p.m. on October 11. However, the State presented evidence that
McFarland was not acting alone two hours later. Dudley testified that he saw a woman
and a man sitting in the gold Chevy pickup truck behind the strip center about 9:00 p.m.,
and Guzman testified that she heard a single gunshot sometime between 9:00 and 10:00
p.m. 

 The appellant's statement to Officers Robinson and Busby in the Bexar County
Jail is also highly probative of his guilt. He acknowledges that he "made a statement at
the Bexar County Jail describing how [Lopes] had died," but argues that "it could easily
have been [McFarland] that described this to [him]." The appellant's statement was not a
mere description of the circumstances of Lopes's death, it was an admission of his direct
involvement in the murder. The appellant told Robinson that he would kill him "just like
he had killed [his] home boy, Lopes." 

 The appellant also complains that the State "relied heavily" on his flight to avoid
arrest in San Francisco as evidence of his guilt. Although the appellant's flight was
indicative of guilt, it was certainly not the only evidence against him. The evidence at
trial showed that Lopes was bound and was taken to the field behind the strip center
where he was shot and killed. The appellant admitted to detention officers that he killed
Lopes and imitated the way he threatened Lopes when he begged for his life. When the
appellant was apprehended in San Francisco, he was in possession of not only Lopes's
vehicle and personal belongings, but also the gun that was used to kill him. Based on the
evidence at trial, a rational jury could have concluded beyond a reasonable doubt that the
appellant committed murder in the course of kidnapping or robbery. (6) Point of error seven
is overruled. 

B. Factual Sufficiency

 The appellant challenges the factual sufficiency of the evidence in his eighth point
of error. In a factual sufficiency review, we view all the evidence in a neutral light and
set aside the verdict only if (1) the evidence was too weak to support a finding of guilt
beyond a reasonable doubt or (2) if the contrary evidence was so strong that the evidence
in favor of the verdict could not have established guilt beyond a reasonable doubt. (7) The
appellant challenges the factual suffiiency of the evidence under the first prong only.

 The appellant points the finger at McFarland and argues that the State failed to
prove that he was the one who actually killed Lopes. The appellant's statement to
Robinson and Busby in the Bexar County Jail, however, was a significant piece of
evidence showing that he did in fact kill Lopes. The appellant complains about the
"circumstantial nature" of this case. The value of circumstantial evidence is often equal
to, or even greater than, that of direct evidence. (8) Evidence that the appellant possessed
Lopes's property and the murder weapon and fled from police to avoid arrest was also
highly probative of his guilt.

 We cannot say that the evidence was so weak that the jury could not have found
guilt beyond a reasonable doubt. Point of error eight is overruled. 

III. VOIR DIRE

 In his first point of error, the appellant contends the trial court erroneously granted
the State's challenges for cause to six venire members: Ofelia Hernandez, Amy Martinez
Whitehead, Sylvia Holguin, Mary Jane Gignac, Judith Gee, and Charlie McNeil. The
appellant asserts that this violated his rights under the Fifth and Fourteenth Amendments
to the United States Constitution and Witherspoon. (9) 

 Venire members who can set aside their beliefs against capital punishment and
honestly answer the special issues are not challengeable for cause. (10) Venire members are
challengeable for cause if their views regarding the death penalty would prevent or
substantially impair the performance of their duties in accordance with their instructions
and oath. (11) 

 We review a trial court's ruling on a challenge for cause with considerable
deference because the trial court is in the best position to evaluate a venire member's
demeanor and responses. (12) We will reverse a trial court's ruling on a challenge for cause
only if a clear abuse of discretion is evident. (13) When a venire member's answers are
vacillating, unclear, or contradictory, we accord particular deference to the trial court's
decision. (14) We will not second guess the trial court when the venire members are
persistently uncertain about their ability to follow the law. (15) 

A. Hernandez

 Hernandez initially testified during voir dire that she was "not one to agree with
the death penalty" and that she could not, under any circumstances, vote in such a way
that someone could be put to death. She also expressed concern about her ability to serve
as a juror due to her feelings about the unsolved, recent murder of a close friend. (16) Upon
further questioning by the prosecutor, she again said that she did not think she could
impose the death penalty:

A. I would not consider it. Me.


Q. You, yourself, could not?


A. No.


Q. Are those based upon your religious views, personal views, just the way
you feel?


A. Its not the way I feel, its just that I would not - - I don't - - I can't - - it is
very hard to decide if it is a yes or a no. Yes, I want the death penalty, the
capital for what they did.

 But then, I, in my heart I feel that - - 


Q. That you yourself could never vote to impose the death penalty?


A. I would feel, in me - - yes. Of course, God is there for all of us. Let
God be the judge of that.


Q. Rather than you?


A. I don't think that I would be able to decide that. 


Defense counsel then questioned Hernandez on the issue:

Q. My question is, although you have strong feelings about the death
penalty, can you still follow the court's instructions and listen to the
evidence and make a decision based upon what you hear from the witness
stand?


A. Yes. If I am to serve and I am there, of course I will listen - - 


Q. Okay.


A. - - to the trial. I am not - - what I am trying to say is, I will not - - I
don't think I would be the right person - - 


Q. Okay.


A. - - to send somebody to the death penalty.


Q. Well - - 


A. Presuming they were sent. There has to be a trial in order for - - you
cannot decide that, Okay, he is innocent; no, he is guilty.


Q. Uh-huh.


A. You can't just answer those questions right there and then, like you are
telling me now. Because I haven't heard the trial. I don't know what
happened.


Q. I understand. That is why we have trials. Like you say, we have to have
trials. We can't just say somebody is guilty or not guilty. People have to
make a decision based upon the evidence, what the witnesses say and stuff,
okay? As a juror that is what you would have to do. Can you do that?


A. I don't think so. I don't think that I would be. It is not because of what
happened to my friend . . . .


 In granting the prosecutor's challenge for cause, the trial court stated that it did not
think that Hernandez could set aside her beliefs against capital punishment and honestly
answer the special issues. The trial court's decision is supported by the record. The trial
court did not clearly abuse its discretion in granting the prosecutor's challenge for cause
to Hernandez. (17) 

B. Whitehead

 When the prosecutor first asked Whitehead to explain her feelings about the death
penalty, she stated, "I don't believe in it under any circumstances." She also stated that
she was not familiar with the process for imposing the death penalty in a capital murder
trial. She again stated that she could not impose the death penalty after the prosecutor
explained the process to her. 

 Whitehead answered differently after defense counsel further explained the
process for imposing the death penalty. Defense counsel asked, "Do you think you could
follow the court's instructions, the charge that would be given to you, and the law, and
temporarily set your opinions about the death penalty aside and answer those questions?" 
Whitehead responded, "Yes. I probably could." 

 Whitehead again changed her answers after the prosecutor explained that by 
answering the special issues she was essentially deciding whether or not a defendant
would get the death penalty:

Q. Now, having said that, can you truthfully set your opinions aside about
the death penalty? That is, you are opposed to the death penalty. Can you
set those feelings aside and answer these questions based upon the evidence
or are your feelings such that would prevent you from doing that?


A. I would not. It would prevent me from doing that, if I knew.


 * * *


Q. Could you ever answer those questions yes, yes and no, knowing that,
by those answers, the death penalty is imposed?


A. No, I could not. I couldn't.


Q. And is that because of your feelings about the death penalty?


A. Yes.


 Upon further questioning by defense counsel, Whitehead again stated that she
could not answer the special issues in such a way as to impose the death penalty. The
trial court asked her if she would ignore the evidence and always answer the special
issues so that the death penalty would not be imposed. Whitehead replied, "Probably, if it
- - yes. I mean, I just have really strong beliefs about something like that and I don't
know if I could live with myself." Defense counsel asked her one final time, "Regardless
of what the evidence is, you would always answer in such a way where the death penalty
would not be imposed; is that what you are saying?" Whitehead replied, "Yes."

 Although Whitehead vacillated as to whether she could set aside her beliefs
regarding capital punishment and honestly answer the special issues, she ultimately
testified that she could not do so; thus, we defer to the trial court's discretion. (18) 

C. Holguin

 We next turn to Holguin. The prosecutor explained the different types of
underlying offenses that would elevate a murder to capital murder, and asked Holguin if
they were the types of offenses for which the death penalty might be appropriate. 
Holguin replied, "Yes. But, you know, that's a very broad question. It just depends on
the circumstances. I don't look at things an eye for an eye, tooth for a tooth; it just
depends on what is presented." The prosecutor explained that the case at hand involved
murder in the course of robbery, and Holguin stated that she did not think that murder in
the course of robbery would warrant the death penalty. Holguin, however, later stated: 
"If all the facts were there and the evidence proves that it was intentional, and that he did
really intend to kill him, along with robbing him or whatever, kidnapping, then I may
consider that, I may consider that, it just depends on what is presented. Because, I give
everyone the benefit of the doubt."

 When the prosecutor explained the process for imposing the death penalty in a
capital murder trial, Holguin stated that she could fairly and honestly answer the special
issues based on the evidence. She expressed her belief that if a defendant is sentenced to
life in prison, he should not be eligible for parole, but stated that this belief would not
influence her in answering the special issues.

 Holguin reiterated to defense counsel that her thoughts on parole eligibility for
life-sentenced defendants would not affect her answers to the special issues. Defense
counsel then asked her about her previous statement that murder in the course of robbery
would not warrant the death penalty:

Q. Okay. Now, I know you were talking about your feelings about the
death penalty. At first, you didn't think if a person committed murder in the
course of a robbery, you didn't think that warranted the death penalty. 
Okay?


A. Right.


Q. How do you feel about that after we have had the discussion so far?


A. The same.


Q. Okay. Do you feel like if the Court gave you the instructions that you
have to base your decision solely on what you have heard from the witness
stand, what evidence has been presented, do you feel like you could do that?


A. Yes.


 The prosecutor then questioned Holguin again and the following exchange
occurred:

Q. Capital murder in the course of robbery, capital murder in the course of
kidnapping, it is an intentional killing in the course of robbery or an
intentional killing in the course of kidnapping. All I am asking is what your
personal feelings are. Should the death penalty ever been imposed in one of
those cases?


A. I don't think so.


Q. If the state proves capital murder in the course of a robbery or capital
murder in the course of a kidnapping, beyond a reasonable doubt, and that is
what it is, and you get to the punishment phase, would you always vote so
that the death penalty - - would you always answer these questions so that
the death penalty would not be imposed?


A. So, that it wouldn't be imposed?


Q. Would not be?


A. Yes. I would answer yes to that.


Q. Because, in your mind, it shouldn't be imposed for capital murder in the
course of robbery or kidnapping?


A. Correct. Well, it just depends on the evidence.


 Holguin again expressed some confusion on the subject, and the trial court
continued to questioned her:

THE COURT: Here is the question: The State of Texas has provided that
capital murder involves certain types of crimes. Direct capital murder
would be, for example, murder of a child, intentionally, under the age of
six. Murder of a police officer or peace officer in the performance of their
duties, would also be capital murder.

 If someone commits, intentionally commits a murder during the
course of a robbery, with a weapon - - say armed robbery. The state also
says that if a person intentionally does the killing during the robbery, then
that person is eligible to be charged with capital murder and the state can
seek the death penalty.

 Are you automatically going to say that that sort of a person should
not receive the death penalty?


[DEFENSE COUNSEL]: Judge, she is entitled to say that because, under
the third question, which is the Penry nullification, a particular type of
capital murder, it may be that, given the circumstances of the offense, which
she is entitled to take into account - - 


THE COURT: Well, I am asking if she can consider it. Are you saying that
you could not consider the death penalty for someone accused of that kind
of a case, if it is proven to you beyond a reasonable doubt that it was an
intentional killing?


[HOLGUIN]: Yes.


THE COURT: You could not?


[HOLGUIN]: I could not. You are saying that I could not - - 


THE COURT: I am asking you. Are you saying that you are not able to
ever assess a death penalty for an intentional killing during the commission
of a robbery, or during the commission of a kidnapping?


[HOLGUIN]: That I could not - - 


THE COURT: Consider it.


[HOLGUIN]: No, no.


THE COURT: Okay. You are saying you would never be able to consider
that?


[HOLGUIN]: Right.


 The prosecutor challenged Holguin for cause "based upon her inability to follow
the law." Over defense counsel's objections, the trial court granted the prosecutor's
challenge for cause. One of the theories alleged in the indictment was murder in the
course of robbery. Because Holguin vacillated, then expressed her inability to consider
the death penalty under that particular circumstance, we will defer to the trial court's
discretion. (19) 

D. Gignac

 Gignac stated in her jury questionnaire that she was opposed to capital punishment
under any circumstances due to her religious beliefs. When the prosecutor asked Gignac
to express her thoughts about the death penalty during voir dire, she stated: "My belief is,
I don't feel I could judge. I am not God and I cannot say whether a person should live or
die. I wouldn't go out an[d] hurt somebody and I don't - - I couldn't do that to the worst
people in the world, even if that person murdered somebody personal to me, to my
family." Gignac further testified that she was "born to a Catholic family" and was taught
that "if somebody slaps your face you turn your cheek and have them slap the other side." 
She stated that she could not set aside her beliefs about the death penalty and that she
could never answer the special issues in such a way as to impose the death penalty. 

 When questioned by defense counsel, Gignac again stated that she did not believe
in the death penalty. She acknowledged that it caused her stress to even discuss the issue. 
The trial court finally asked, "Your religious beliefs would preclude you, in any
circumstance, any circumstance that would be conceivable to you, to ever even consider a
death penalty; is that what you're saying?" Gignac responded, "Yes, sir."

 Gignac clearly expressed that she could not set aside her beliefs against capital
punishment and honestly answer the special issues. The trial court properly granted the
State's challenge for cause to Gignac. (20) 

E. Gee

 When the trial court questioned Gee regarding her feelings about the death penalty,
she stated, "I do have strong feelings on capital punishment. And, bottom line, I do not
feel I could, in all good faith on my part - - I cannot assign death to anybody." Gee stated
that she could decide guilt or innocence based on the evidence, but that she could not
follow the law and consider the evidence if doing so would result in the imposition of the
death sentence. She reiterated upon questioning by the prosecutor that she was not in
favor of the death penalty. She acknowledged that she could not vote for the death
penalty regardless of the facts and circumstances of the case. Defense counsel declined to
question Gee, but objected to the prosecutor's challenge for cause. On this record, we
cannot conclude that the trial court clearly abused its discretion to grant the prosecutor's
challenge for cause to Gee. (21)

F. McNeil 

 McNeil first testified that he was concerned with his ability to "render a fair
judgment" due to his personal feelings about the death penalty. He stated in response to
questioning by the prosecutor that he did not believe that he had the right to take someone
else's life and that he did not want that on his conscience. The prosecutor discussed the
different ways to commit capital murder and asked McNeil if he could have an "open
mind" about the death penalty being appropriate in those types of cases. McNeil
responded, "I would have to say no." The prosecutor then explained the process for
imposing the death penalty and asked McNeil if he could honestly answer the special
issues in such a way as to impose the death penalty:

A. Okay. I guess - - well, based upon what, you know, you presented to
me, explained to me, I feel that I would be able to present it fair, without
being biased. So - - I didn't really understand the actual process.


Q. Uh-huh.


A. I would say yes.


Q. Okay. You are willing to take each question and, knowing that if you
answer it in that way, like I said, the judge is bound by what you say and he
has to impose the death penalty. If you answer it in the way that I said.


A. Yes.


 Upon further questioning by the prosecutor, McNeil acknowledged that he stated
in his jury questionnaire that he did not believe in capital punishment under any
circumstances. The prosecutor asked him if he could put aside his beliefs in order to 
fairly evaluate the evidence and consider the death penalty. McNeil asked the prosecutor
to explain the process for imposing the death penalty again. After the prosecutor
explained the process, the following exchange occurred:

Q. So, I guess, what we really need to know is, are you truthfully going to
be able to set aside the opinion that you have about the death penalty in
order to listen to the evidence with an open mind and truly consider the
option of the death penalty?


A. Yeah. But, I would like to correct myself. The way you explained
them, broken them down to me, and knowing my honest beliefs on this, I
am going to have to say no, I guess. Because if - - me, personally, if I took
the chance and, if selected, knowing these things, and it came out to be the
death penalty, you know, that is almost putting yourself in a situation. So, I
would have to say no, no.


Q. Then you are telling us that you cannot honestly participate in a process
where the answers to those questions as yes, yes and no, if you, and
knowing that now, you cannot participate, honestly, in that process that
might impose the death penalty?


A. Right. Yes. That is correct.


 McNeil continued to express reservations about his ability to serve as a juror in the
instant case when questioned by defense counsel:

Q. Let me say, it is going to be hard for anybody to sit on this jury because
- - I mean, we are - - this is reality right here. The state wants to execute
this man right here. It is going to be hard for any juror, then, on this case. 
Okay?

 But, like I said, he is entitled to have somebody that is opposed to the
death penalty sit on the jury, just like the state is entitled to have somebody
that favors the death penalty, if they can set aside [their] personal feelings
and make a decision based upon the evidence. That is the bottom line. Can
you do that?


A. I would have to say no, knowing what may be the outcome. Because
there is always the possibility it could go either way. I guess that is my true
feelings. I could go and listen to the evidence with the other jurors, and go
by this list, but - - I mean, ultimately, based upon how this is answered, this
person's life is - - if it came to death penalty I would feel that I contributed
to that. 

 Granted, if this person, if he is found guilty, I don't know, I feel that,
I guess, with the death penalty, I feel that it is an easy way out. If you take
somebody's life, I think that you - - he should be allowed to live and deal
with it. But, based upon what we are talking about here, it would be hard.


Q. So, regardless of what the state proved, regardless of what they put on,
you would always answer these questions in such a way where a life
sentence would be imposed instead of [the] death penalty?


A. Yes.


 The prosecutor challenged McNeil for cause and defense counsel objected, arguing 
that "at one point" McNeil said he could set aside his beliefs and honestly answer the
special issues. Although McNeil vacillated at one point, he ultimately testified that he
could not set aside his beliefs and answer the special issues in such a way as to impose the
death penalty; thus, we defer to the trial court's discretion. (22) Point of error one is
overruled. 

IV. JURY OATH

 In his fifth point of error, the appellant argues that "[t]he trial court abused its
discretion when it failed to administer the required oath to the jury pursuant to [A]rticle
35.22 of the Texas Code of Criminal Procedure, in violation of the Sixth and Fourteenth
Amendments to the United States Constitution and Article 1, Section 10 of the Texas
Constitution." Article 35.22 provides as follows:

When the jury has been selected, the following oath shall be administered
them by the court or under its direction: "You and each of you do solemnly
swear that in the case of the State of Texas against the defendant, you will a
true verdict render according to the law and the evidence, so help you God."


After jury selection, the trial court administered the oath to the jury using the following
language: "Do you and each one of you solemnly swear or affirm that you will a true
sentence return, based on the evidence and the facts in this case, so help you God?" The
appellant complains that the oath was not in compliance with Article 35.22 because the
trial court used the word "sentence" in place of the word "verdict." 

 Defense counsel failed to object on this basis when the trial court administered the
oath at the beginning of the trial. After closing arguments during the guilt phase of the
trial, defense counsel made the following request: "Your Honor, before the case is
submitted to the jury, we would ask that the jury be sworn, as required by 35.22, of the
Code of Criminal Procedure." Defense counsel stated that this was not done at the
beginning of the trial. The trial court replied, "I believe you're wrong, but I will go ahead
and redo that, if you would like." The prosecutor countered, "It's unnecessary, judge. 
You have already sworn in this jury. They don't need to hear it twice. It's been done. If
you want to, it's fine." The trial court then overruled defense counsel's request and sent
the jury to the jury room. Shortly thereafter, the trial court reconsidered its ruling and
proceeded to the door of the jury room to administer the oath. The trial court stated,
"Now, this time, out of an abundance of caution, even though I believe the record will
reflect this jury was duly sworn, I am going to give the oath under 35.22, as requested by
the defense." Defense counsel objected that the oath was untimely, and the trial court
overruled the objection and administered the oath as follows:

THE COURT: All right. Would all of you please stand and raise your right
hand? 

 Do you and each of you solemnly swear that in the case of the State
of Texas against the defendant, Joshua Maxwell, you will a true verdict
render, according to the law and the evidence, so help you God?


JURORS: I do.


 The appellant asserts that the jury was unsworn because the oath that the trial court
administered to it at the beginning of the trial was not in the form prescribed by Article
35.22. He argues that it is mandatory for the jury to be given the oath in the form
prescribed by Article 35.22, citing Howard, Crisp, and Leer v. State (23) in support of his
claim. In Howard, the judgment of conviction was reversed because the jury was not
sworn, as provided by the statute, when impaneled to try the particular case at hand. (24) In
Crisp, the judgment of conviction was reversed because the trial court omitted "so help
you God" when administering the oath. (25) In Leer, the judgment of conviction was
reversed because "another and different oath was administered to the jury than the one
prescribed by law." (26) These cases can all be distinguished from the case at hand because
here the proper and correct jury oath was read to the jury before jury deliberation.

 We have held that the complete failure to administer the proper jury oath is a
reversible error that may be raised for the first time on appeal. (27) However, in this case,
there was not a complete failure in the administration of the jury oath. The trial court
administered the jury oath at the beginning of trial with a slight variance. Defense
counsel failed to object at that time. Instead, defense counsel waited until after closing
arguments and at the time immediately before the jury was to begin deliberations to raise
this issue. The current rules of procedural default require a defendant to object "at a time
when the trial court is in a proper position to do something about it." (28) The proper time in
this case to raise an objection was at the beginning of trial, and the trial court did do
something about the variance; when the issue was raised, the trial court promptly gave the
oath. 

 Furthermore, the appellant never objected at trial on the basis of the Sixth and
Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the
Texas Constitution. As a result these claims were not preserved for review. Point of
error five is overruled.

V. EVIDENCE OF FLIGHT

 In his second point of error, the appellant asserts that the trial court erroneously 

admitted uncharged-misconduct evidence during the guilt phase of the trial. He
complains specifically about the evidence of the high-speed chase and the shoot-out with
police that occurred during his flight from police officers in San Francisco. He argues
that this evidence was inadmissible because it was irrelevant, cumulative, and more
prejudicial than probative. (29) He also contends that the admission of this evidence violated
his pretrial motion in limine. 

 Evidence that a defendant fled is admissible as a circumstance from which an
inference of guilt may be drawn. (30) Before evidence that the defendant fled may be
admitted, however, it must appear that it has some relevance to the charged offense. (31) 
Once this relevance requirement is met, this evidence is admissible unless the defendant
shows that the flight was due to circumstances unrelated to the charged offense. (32) A lapse
of time between commission of the offense and the defendant's flight does not always
adversely affect admissibility of evidence. (33) The fact that uncharged misconduct is
committed while the defendant is fleeing does not render the evidence inadmissible. (34) So
long as the uncharged misconduct is shown to be a relevant circumstance of the
defendant's flight, it may be admitted before the jury. (35) 

 The trial court granted the appellant's pretrial motion in limine requesting that the
State not be permitted to present evidence of uncharged misconduct without first having a 
hearing outside the presence of the jury to determine its admissibility. Prior to the State's
presentation of the evidence of the appellant's flight, and outside the jury's presence,
defense counsel lodged his objections to the evidence. The trial court overruled defense
counsel's objections and stated:

. . . The circumstances, which occurred, [are] more probative in value than
prejudicial, in my mind. Particularly, in light of the fact that at the time that
the chase initially occurred, the only offense to which the police reasonably
believed there was involved with the driver of that vehicle, Mr. Maxwell,
was that he had run a red light.

 

 Certainly, the facts that occurred afterwards leaves an inference of
guilt, as is stated in the case laws [sic] and is admissible for those reasons. 
Flight is an indication of guilt, as you know.


 The State then called six witnesses to testify about the appellant's flight and
subsequent arrest in San Francisco. Officers Juarez and Pena testified that the appellant
sped through an intersection in a gold pickup truck, drove away when they attempted to
stop him for the traffic offense, led them on a chase through the downtown area in rush
hour traffic, and fired at them during the chase. They further testified that the bullet fired
by the appellant penetrated their windshield, came within inches of hitting Juarez, and
sprayed their car with tiny glass fragments, which scratched Pena's eyes. Kerry
Dalrymple of the San Francisco Emergency Communications Department testified
regarding the police radio transmissions that were recorded during the chase. Officer
Seidell testified that he became involved in the chase after it was already underway. 
During the chase, Seidell observed that the appellant "reached out with his left arm and
hand and raised his middle finger and flipped us off." Officer McDonagh testified that he
set up a roadblock with his vehicle, which stopped traffic and ultimately ended the chase. 
Officer Haskell testified that he transported the appellant to the police station after the
chase ended, that he searched the appellant when they arrived at the police station, and
that the appellant was wearing a gold-chain necklace at that time. 

 The appellant was driving Lopes's truck when the San Francisco police attempted
to stop him for a traffic violation on October 17, five days after Lopes's body was found
and his truck was reported missing. The appellant was in possession of Lopes's personal
belongings, including his handgun, which the appellant used to fire at police during the
chase. The fact that the appellant went to such great lengths to elude capture after being
stopped for a minor traffic violation was relevant to, and indicative of, his guilt with
regard to Lopes's murder. 

 The trial court took measures to prevent the flight evidence from being cumulative. 
It refused to admit the audio recording of the police radio transmissions, instead admitting
only a redacted, printed version. It allowed Seidell to testify about the appellant's hand
gesture, but refused to allow him to testify about the facial and verbal expressions that
accompanied it. It permitted McDonagh to testify "as to the very limited portion and
scope of . . . the extraordinary measures that were taken by the defendant and what had to
be done to stop the chase." Finally, it limited Haskell's testimony to the events that
transpired after the chase ended.

 The trial court did not abuse its discretion in admitting the evidence of the
appellant's flight and the uncharged misconduct that he committed in the course of his
flight. Point of error two is overruled.

VI. LESSER-INCLUDED OFFENSES

 The appellant asserts in his third point of error that the trial court erroneously
refused to instruct the jury on the lesser-included offenses of robbery, theft, unauthorized
use of a motor vehicle, and unlawfully carrying a weapon. He argues that the trial court's
refusal to instruct the jury on these lesser-included offenses violated his rights under the
Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 10 of
the Texas Constitution.

 We use a two-prong test to determine whether a defendant is entitled to an
instruction on a lesser-included offense. (36) The first step in our analysis is to determine if
the lesser offense is included within the proof necessary to establish the offense
charged. (37) The second step requires an evaluation of the evidence to determine whether
there is some evidence that would permit a jury to rationally find that the defendant is
guilty only of the lesser offense. (38) In other words, there must be some evidence from
which a jury could rationally acquit the defendant of the greater offense while convicting
him of the lesser-included offense. (39) The evidence must establish the lesser-included
offense as a valid rational alternative to the charged offense. (40) 

 In order to convict the appellant of capital murder, the charge required the jury to
find beyond a reasonable doubt that the appellant intentionally committed murder in the
course of committing or attempting to commit robbery or kidnapping. Robbery is
contained within the proof necessary for murder in the course of robbery. Theft is
included within the proof necessary to establish robbery. However, unauthorized use of a
motor vehicle and unlawfully carrying a weapon are not included within the proof
necessary to establish the offense charged under the circumstances in the instant case. (41) 
Therefore, unauthorized use of a motor vehicle and unlawfully carrying a weapon are not
lesser-included offenses of the capital murder charged in this case. 

 The appellant argues that the jury could have believed that McFarland was
responsible for the robbery, kidnapping, and murder, and that the appellant "came into the
situation" at a time when he would be guilty only of unauthorized use of a motor vehicle
and theft. He also argues that the jury could have believed that McFarland was the one
who committed the murder and all of the underlying crimes and that the only thing that
the appellant was guilty of was being with her. The evidence shows otherwise. A
witness testified that he saw a man and a woman in Lopes's truck parked near the spot
where Lopes's body was later found. Another witness testified that she heard a gunshot
shortly thereafter. The appellant and McFarland were apprehended six days later, after
leading officers on a chase through downtown San Francisco. The appellant was driving
Lopes's truck, which contained Lopes's gun and personal belongings and the gun that
killed Lopes. Finally, while in the county jail awaiting trial, the appellant admitted his
direct involvement in Lopes's murder and described the circumstances of Lopes's death. 
The jury could not have rationally acquitted the appellant of capital murder while
convicting him of any of the lesser-included offenses. (42) The appellant has failed to satisfy
the second prong of the test; thus, the trial court did not err in refusing his request that the
jury be instructed on the lesser-included offenses of robbery and theft. Point of error
three is overruled.

VII. JURY MISCONDUCT

 In his fourth point of error, the appellant contends that the trial court erred in
denying his motion for a mistrial "based upon juror misconduct in receiving outside
influences." (43) He also argues that he was denied the right to full inquiry because the trial
court refused to let him question all of the jurors about outside influences. (44) 

 The record reflects that during the punishment phase Juror Morgan Miles called
her brother, Robert Lee, an attorney in Dallas, to ask him "what a 403 was." Miles
testified that Lee was appalled that she would ask him such a question and informed her
that if she had any questions she should present them in writing to the judge. They did
not discuss the facts of the case, and their conversation lasted less than a minute. Lee
called back "like five seconds later" and told Miles that she should not have called him
and that she could have caused a mistrial. Miles testified that Tom Cox, the jury foreman,
was present in the jury room when she called Lee. Juror Geoffrey Maitland came into the
jury room later, but Miles did not think he was present when she was talking to Lee. 

 Cox testified that Miles first called her brother and left a message on his answering
machine asking him what 403 meant. Miles also asked Cox what 403 meant, and he
stated "that's where they talk about probative value." Cox asked Miles what kind of law
her brother practiced, and she said that he was a corporate attorney. Miles made a second
phone call and spoke to her brother. She told him that she was serving on a jury and
asked him what 403 meant. The phone call was brief and Miles seemed surprised by her
brother's reaction. When Miles got off the phone, she told Cox that her brother said that
if she had questions, she should to address them in writing to the trial judge. Cox testified
that no other jurors were present when Miles was talking to her brother.

 Maitland testified that when he entered the jury room Miles and Cox were present
and Miles was not on the phone. Someone called Miles on her cell phone a few minutes
later and Maitland heard Miles say, "Okay, I won't call you again." After Miles got off
the phone, she mentioned that she called her brother to ask what 403 meant, and that he
became irate and told her that she should address the judge if she had any questions. 
Maitland testified that a few other jurors may have been present later when Miles 
repeated "that she had called her brother and he got really irate with her." Maitland
stated, "I recall that there may have been, you know, two or three additional jurors. 
Specifically, who they were, I do not know." 

 Robert Lee, Miles's brother, testified via telephonic conference call regarding the
details of his conversation with Miles:

This morning - - approximately, 8:30 this morning - - I received a phone
call from my sister, Morgan Miles. In that phone call, she informed me, for
the first time, that she was on a capital murder case, and she said that they
were in the punishment phase. I just kind of said, "Wow, that's amazing."

 And she said, "Well, I just - - we had a question about one of the
rules or one of the issues," and I don't remember exactly, but it was along
of lines of she had a question concerning how something was to be
interpreted. And as soon as she started to ask, I immediately said, "Hold
on. Hold on. Hold on." I said, "Did anyone instruct you that you're not
suppose[d] to be getting any information outside the courtroom?" And she
goes, "Well, no, I don't remember that."

 I said, "Well, if I were to provide you any information or you were to
get any information and impart that to your fellow jurors, you would have a
nullification of the trial and it would be like a mistrial. And it would be
completely improper for me to say anything." And she said, "Well, I just
wanted to know." I said, "I don't care. I cannot say anything, whatsoever." 
At that point, she said, "Okay," and we hung up.

 I immediately, maybe two minutes later, called back, onto her cell
phone, and told her, "You need to bring whatever issues you have to the
judge's attention." And she said, "Okay. I won't call you again," and then
hung up. That was pretty much the extent of that conversation.


 * * *


 Well, when I got back into the office - - when I got to the office, I
was - - like I said, I was in my parking garage practically - - I had a message
on my recorder and it obviously had been made before the phone call I
received. And on that message was, "We - - I just wanted to know," I don't
remember "we" or "I," but "just wanted to know whether, you know, what
is meant by," I think she said, "Rule 403." And she was saying something
about the difference between prejudicial evidence versus nonprejudicial.

 And I heard, in the background, someone prompting her on the rule
number. It sounded like a male voice of some kind, prompting her. Which,
initially, led me to believe that, possibly, they could be in the jury
deliberation room of some kind, and that she was - - and that maybe the
original phone call and that phone call were made on her cell phone in some
type of jury deliberation room of some kind.


 * * *


 And I never called back after that point. That's when I discussed it
with a couple other attorneys here and then called the court.

 

 After hearing the testimony of Miles, Cox, Maitland, and Lee, the trial court
denied the appellant's motion for a mistrial. The trial court also refused to allow defense
counsel to question the remaining jurors. The trial court did, however, comply with
defense counsel's request to admonish the jurors again not to discuss the case with other
people and not to watch or read any media reports about the case. 

 Article 36.22 provides, "No person shall be permitted to be with a jury while it is
deliberating. No person shall be permitted to converse with a juror about the case on trial
except in the presence and by the permission of the trial court." The appellant has the
burden of proving an allegation of juror misconduct. (45) When a juror converses with an
unauthorized person about the case, injury is presumed. (46) However, the State may rebut
this presumption of harm by showing that the case was not discussed or that nothing
prejudicial to the accused was said. (47) We defer to the trial court's resolution of historical
facts and its determinations concerning credibility and demeanor, and we view the
evidence in the light most favorable to the trial court's ruling. (48) Where there is
conflicting evidence there is no abuse of discretion if the motion is overruled. (49) 

 Miles admitted that she conversed with Lee during the punishment phase of the
trial. Miles briefly asked Lee what "403" meant, and they did not discuss the facts of the
case. Lee refused to answer Miles's question, reprimanded her for calling him, and told
her to direct her questions in writing to the judge. He quickly terminated the conversation
and informed the trial court of the situation. Cox and Maitland were aware that Miles
conversed with Lee. Miles, however, only related to them that Lee became angry, refused
to answer her question, and told her to address her question to the judge. Miles, Cox, and
Maitland all testified that they would follow the instruction to base their decision solely
on the evidence presented in the courtroom and to follow the law given to them by the
trial court. At the close of the hearing, the trial court stated that the communication
between Miles and Lee was improper, but concluded that there was no harm because
there was no indication that the jury was tainted by the improper communication. The
evidence, viewed in the light most favorable to the trial court's ruling, supports the trial
court's decision to deny the appellant's motion for a mistrial. 

 There was conflicting evidence as to whether any other jurors were aware of
Miles's conversation with Lee. Miles testified that Cox was present during the entire
conversation and that Maitland entered the jury room later. Cox testified that he was the
only person present when Miles was talking to Lee. Maitland testified that a few other
jurors might have heard Miles say that she had called her brother and he became angry
with her. We defer to the trial court and discern no abuse of discretion in the trial court's
decision not to allow the appellant to question the rest of the jury on this issue. (50) Point of
error four is overruled. 

VII. UNCHARGED MISCONDUCT

 In his sixth point of error, the appellant challenges the admission of evidence that
he and McFarland robbed and murdered a man named Robert Bott in Indiana about a
month prior to the instant offense. He argues that the trial court abused its discretion by
admitting evidence of this uncharged misconduct during the punishment phase of his trial. 

 Article 37.071, Section 2(a) gives the trial court wide latitude in admitting or
excluding evidence of extraneous offenses at the punishment stage of a capital trial. (51) 
The trial court has the discretion to admit any evidence relevant to the jury's
determination of a capital defendant's deathworthiness. (52) The trial court's ruling will be
upheld as long as it was within the zone of reasonable disagreement. (53) 

 When offering uncharged misconduct during the punishment phase of a capital
trial, the State need not prove all of the elements of an uncharged offense. (54) However, the
State must clearly prove that the uncharged offense was committed and that the defendant
was the perpetrator of the offense. (55)

 The State introduced evidence that Bott's body was found in Marion County,
Indiana, on September 12, 2000. His badly charred body was inside the trunk of his
Mercury Cougar automobile, which had been set on fire. He had suffered a fatal gunshot
wound to his chest, and his hands and feet had been bound together behind his back. The
medical examiner did not recover a bullet from Bott's body during the autopsy. 

 When police arrived at Bott's residence in Mooresville, Indiana, they discovered
that the back door was open and the house was in disarray. The appellant's fingerprints
matched the fingerprints on a vodka bottle and a wine bottle in the kitchen. McFarland's
fingerprints matched the fingerprints on the refrigerator door, a videotape, and a pizza
box. A pizza delivery slip found in Bott's bedroom contained the appellant's name and
the address of a house in nearby Indianapolis where the appellant had been staying with
McFarland. 

 Police searched the house in Indianapolis and found several items belonging to
Bott, including his wallet, various forms of identification, credit cards, and bank
statements. The appellant's fingerprints matched the fingerprints on a sales receipt in
Bott's wallet. Substances that appeared to be blood and vomit trailed from the basement
to the outside of the Indianapolis residence. The basement smelled strongly of chemicals
and contained some empty gallon jugs of muriatic acid. A spent cartridge casing was
recovered from an overturned wooden wardrobe cabinet in the basement. A spent bullet
was recovered from a sweater inside the wardrobe cabinet. A firearms examiner testified
that the gun that fired the spent bullet and spent cartridge casing was the same gun that
was used to kill Lopes in this case.

 The appellant, Bott, and a female were seen shopping at two retail stores in the
Indianapolis area at 11:30 p.m. on September 10 and at 5:00 a.m. on September 11. Bott
used his credit card to purchase approximately $2500 of merchandise at the first store. 
When the night manager commented that they were buying an unusually large amount of
merchandise at that time of night, the appellant explained that he and the female were
getting married and that Bott was his uncle and was buying them the merchandise as a
wedding gift. Bott made a credit card purchase of approximately $1100 at the second
store, where the threesome were recorded on the store's security surveillance camera. At
approximately 6:00 a.m. on September 11, a man was recorded on videotape making
withdrawals with Bott's ATM card at a nearby Bank One ATM terminal. He made two
withdrawals, and his attempt to withdraw more money was declined because it exceeded
the daily limit.

 When police searched Lopes's truck after the appellant and McFarland were
captured in California, they found a map with a route drawn from Indiana to Florida to
Texas to California. Police also found a videotape that depicted the appellant admitting
his involvement in a murder. The appellant explained on the videotape that he forced a
man to take him on a shopping spree, stole items from his house, killed him, put him in
his car, and burned him.

 The evidence that the appellant killed Bott was relevant to, and probative of, the
issue of future dangerousness. The State provided clear proof that an offense was
committed and that the appellant was the perpetrator. The trial court's decision to admit
this evidence was within the zone of reasonable disagreement. 

 The appellant also alleges in his sixth point of error that the evidence is
insufficient to support the jury's affirmative answer to the future dangerousness special
issue. In addition to the evidence that the appellant robbed and murdered Bott, the State
presented, during the punishment phase, evidence that the appellant had a lengthy
criminal history, including numerous adjudications and convictions both as a juvenile and
as an adult. The State also presented evidence that the appellant wrote graffiti in his cell,
verbally threatened guards, and physically assaulted a deputy while he was incarcerated in
the county jail awaiting trial for this offense. The facts of this case and the circumstances
of the appellant's flight also support the jury's answer to the future dangerousness
question. (56) The evidence, viewed in the light most favorable to the verdict, is sufficient to
support the jury's affirmative answer to the future dangerousness special issue. (57) Any
rational trier of fact could have found beyond a reasonable doubt that there is a
probability that the appellant would commit criminal acts of violence constituting a
continuing threat to society. (58) Point of error six is overruled.

 We affirm the judgment of the trial court.

Delivered: November 17, 2004 

Do Not Publish
1. Tex. Pen. Code § 19.03(a). 
2. Art. 37.071, § 2(g). Unless otherwise indicated, all references to Articles refer to the
Texas Code of Criminal Procedure.
3. Art. 37.071, § 2(h). 
4. See Jackson v. Virginia, 443 U.S. 307, 319 (1979).
5. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim. App. 1999).
6. Jackson, 443 U.S. at 319. 
7. Zuniga v. State, No. 539-02, slip op. at 14, 2004 Tex. Crim. App. LEXIS 668 (Tex.
Crim. App., delivered April 21, 2004).
8. Goodman, 66 S.W.3d at 296.
9. Witherspoon v. Illinois, 391 U.S. 510 (1968). 
10. Id., at 522. 
11. Wainwright v. Witt, 469 U.S. 412, 424 (1985).
12. Colburn v. State, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998).
13. Ibid.
14. Ibid.
15. Ibid.
16. Neither the prosecutor nor defense counsel challenged Hernandez on this basis.
17. Colburn, 966 S.W.2d at 517.
18. Ibid.
19. Ibid.
20. Ibid.
21. Ibid.
22. Ibid.
23. Leer v. State, 2 Tex. Ct. App. 495 (1877).
24. Howard v. State, 192 S.W. 770, 773 (1917). 
25. Crisp v. State, 220 S.W. 1104, 1106 (1920). The holding that the oath must include
"so help you God" was overruled in Craig v. State, 480 S.W.2d 680, 684 (Tex. Crim. App.
1972).
26. Leer, 2 Tex. Ct. App. at 496.
27. White v. State, 629 S.W.2d 701, 704 (Tex. Crim. App. 1981) (citing Howard v. State,
80 Tex. Crim. 588, 192 S.W. 770 (1917)). 
28. See Posey v. State, 966 S.W.2d 57, 62 (Tex. Crim. App. 1998) (citing Lankston v.
State, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).
29. Tex. R. Evid. 401, 402, 403.
30. Alba v. State, 905 S.W.2d 581, 586 (Tex. Crim. App. 1995).
31. Burks v. State, 876 S.W.2d 877, 903 (Tex. Crim. App. 1994). 
32. Ibid.
33. Ibid.
34. Foster v. State, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989). 
35. See ibid.; Alba, 905 S.W.2d at 586. 
36. Rousseau v. State, 855 S.W.2d 666, 673 (Tex. Crim. App. 1993). 
37. Ibid. 
38. Moore v. State, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); Rousseau, 855 S.W.2d at
672. 
39. Moore, 969 S.W.2d at 8. 
40. Wesbrook v. State, 29 S.W.3d 103, 113-14 (Tex. Crim. App. 2000).
41. Art. 37.09; Jacob v. State, 892 S.W.2d 905, 906 (Tex. Crim. App. 1995) (stating that
the determination of whether an offense is a lesser-included offense must be done on a
case-by-case basis).
42. Moore, 969 S.W.2d at 8. 
43. See Art. 36.22. 
44. See Tex. R. Evid. 606(b).
45. Hughes v. State, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). 
46. Alba, 905 S.W.2d at 587. 
47. Ibid. 
48. Quinn v. State, 958 S.W.2d 395, 401- 402 (Tex. Crim. App. 1997). 
49. Hughes, 24 S.W.3d at 842. 
50. Ibid.
51. Id., at 843. 
52. Ibid. 
53. Ibid.
54. Powell v. State, 898 S.W.2d 821, 830 (Tex. Crim. App. 1994). 
55. Chamberlain v. State, 998 S.W.2d 230, 235 (Tex. Crim. App. 1999). 
56. See Sonnier v. State, 913 S.W.2d 511, 516 -17 (Tex. Crim. App. 1995) (holding that
the facts of the offense alone may be sufficient to support an affirmative answer to the future
dangerousness question). 
57. Jackson, 443 U.S. at 319 (1979). 
58. Ibid.